THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CASE NO. 1:23-CR-189-JRR |
| | * | |
| JOHN H. WORTHINGTON, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| ******* | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Between 2010 and 2021, the defendant, John H. Worthington, stole over $2.8 million from the United States. Worthington knew that he had a duty to collect, report, and pay over employment taxes to the Internal Revenue Service ("IRS") in his capacity as the sole owner and operator of his restaurant, The Grill at Harryman House. But he accomplished only the first part. Each year, he collected thousands of dollars in ostensible taxes from his employees' wages and provided the employees with Forms W-2 that stated that their social security, Medicare, and federal income taxes had been appropriately withheld from their wages. But instead of reporting and paying over those tax withholdings to the IRS, along with his employer's share of the social security and Medicare taxes, Worthington kept the money for himself.

Significantly, this fraud began well before 2010: the IRS has no record of Worthington having ever filed Forms 941 (Employer's Quarterly Federal Tax Returns) since he became the sole owner of the restaurant in 1995. The Government has not determined the extent of the tax harm caused by Worthington's fraud for these additional fifteen years.

In addition to failing to meet his tax obligations as an employer, Worthington also committed fraud with respect to his own individual income taxes. In 2016, Worthington willfully filed a Form 1040 (U.S. Individual Income Tax Return) that fraudulently claimed a

refund of $9,096 from the IRS—which Worthington received—instead of accurately reporting that Worthington owed the IRS approximately $15,111 in taxes. This refund was issued because Worthington had falsely claimed that he had paid withholdings as part of his paycheck with the restaurant, which he knew he had not done. Moreover, from 2017 to 2021, Worthington failed to timely file any individual income tax returns despite earning wages and compensation in amounts that required him to file.

Worthington's decades-long disregard for the nation's tax laws was not born out of desperation. He used the proceeds of the fraud to help pay himself a generous tax-free salary and to pay for personal expenses, including country club membership dues, season tickets to the Baltimore Orioles, international vacations, college tuition for his two children, and mortgage and vehicle payments.

Nor was Worthington's fraud an irrational crime committed in the heat of the moment. Like other white-collar criminals, Worthington made the decision to steal based on a simple calculation he made year after year: that the benefits outweighed the risks. That is precisely why the U.S. Sentencing Commission has emphasized that the primary goal of sentencing in tax cases is to achieve general deterrence. *See* U.S.S.G. ch. 2, pt. T, introductory cmt. As the Fourth Circuit has explained:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2011).

To pursue general deterrence, promote respect for the law, and to finally hold Worthington accountable for his crimes, the Government respectfully recommends that the

Court sentence Worthington to 27 months' imprisonment, followed by 3 years of supervised release. This sentence is within the Guidelines range and supported by the sentencing factors at 18 U.S.C. § 3553(a).

## I. Background

### A. Procedural History

On June 22, 2023, pursuant to a plea agreement, Worthington pleaded guilty to a two-count Information charging him with Willful Failure to Account For and Pay Over Taxes, in violation of 26 U.S.C. § 7202 (Count One), and Willfully Making and Subscribing a False Tax Return, in violation of 26 U.S.C. § 7206(1) (Count Two). Presentence Investigation Report ("PSR") ¶¶ 1-2.

### B. Factual Background

#### 1. Worthington's Tax Fraud

For 25 years, Worthington ran a restaurant. For those same 25 years, he was a serial tax cheat.

Worthington is the sole shareholder and President of Harryman House Inc. ("HH Inc."), which he incorporated in Maryland on February 10, 1995. PSR ¶ 8. Through HH Inc., Worthington operated a restaurant under the trade name "The Grill at Harryman House" ("The Grill"), located in Reisterstown, Maryland. *Id.* He was previously a partial owner in a predecessor corporation, 340 Main Street Inc., that operated the restaurant since at least 1985. *Id.* In his role as the owner of HH Inc. and The Grill, Worthington hired its employees, operated its payroll, kept its books and records, maintained signatory authority over its business bank accounts, and controlled all banking transactions. *Id.*

The Internal Revenue Code required employers such as HH Inc. to deduct and withhold federal income and Federal Insurance Contribution Act ("FICA")[1] taxes from its employees' wages at the time they paid their employees and to hold these withheld taxes in trust for the United States. *See* 26 U.S.C. §§ 3402(a); 3102(a). The withheld sums are commonly referred to as "trust fund taxes," reflecting the Internal Revenue Code's provision that such withholdings or collections are deemed to be a "special fund in trust for the United States." 26 U.S.C. § 7501(a); *Slodov v. United States*, 436 U.S. 238, 243 (1978). Each quarter, employers were required to file Forms 941, which are employment tax returns, reflecting a company's employment tax liability for each quarter of the year. *See* 26 U.S.C. § 6302(a), (c); 26 C.F.R. §§ 31.6151-1, 31.6302-1.[2] This total employment tax liability is comprised of the trust fund taxes and non-trust fund taxes, the latter being the employer's matching share of FICA taxes that it must pay to the United States. *See* 26 U.S.C. §§ 3102, 3111; *see also Ross v. United States*, 949 F. Supp. 2d. 272, 275 (D.D.C. 2013) (describing employment taxes).

Since forming HH Inc. in 1995, Worthington never filed Forms 941 with the IRS to report HH Inc.'s quarterly employment tax liability, nor did he pay over employment taxes to the IRS through 2021. PSR ¶ 9 & n.1. Since at least 2010, however, Worthington has withheld trust fund taxes from his employees' wages, as recorded in Forms W-2 (Wage and Tax Statement) that he provided the employees. *Id.* ¶ 9. In other words, Worthington collected the

---

[1]  FICA taxes are comprised of social security and Medicare taxes. *See Ross v. United States*, 949 F. Supp. 2d. 272, 275 (D.D.C 2013).

[2]  Employers with an annual employment tax liability of $1,000 or less may file a Form 944 to annually report their employment tax liability, in lieu of filing quarterly Forms 941. *See Topic No. 758, Form 941 – Employer's Quarterly Federal Tax Return and Form 944 – Employer's Annual Federal Tax Return*, IRS (2023), https://www.irs.gov/taxtopics/tc758.

The IRS has no records indicating that Worthington ever filed a Form 944.

appropriate amount of trust fund taxes from his employees' wages but he never reported or paid over the taxes to the IRS. In total, from 2010 through 2021, Worthington failed to report and pay over approximately $2,813,348.94 in combined employment taxes due and owing to the IRS. *Id.*

Not only did Worthington's failure to report employment taxes deceive the IRS, it also deceived his employees. By giving his employees Forms W-2, Worthington was representing to them that he had appropriately collected and paid social security, Medicare, and federal income taxes to the IRS on their behalf, when he, in fact, had not done so. This created difficulties for some employees when they later learned that they had not been credited with taxes they thought they had paid. For example, "GC," a former employee of The Grill, applied for disability after being permanently disabled in a motorcycle accident. Gov't Ex. 1 ¶ 4 (Memorandum of Interview of GC). Upon doing so, he learned that the Social Security Administration did not have any records of him making social security contributions during the period he worked for The Grill, reducing the amount of disability payments he was eligible to receive. *Id.* ¶ 5. While GC was ultimately able to resolve the issue, he reported losing sleep and spending many hours researching and reviewing records in the process. *Id.* ¶ 7. Every former employee of The Grill who relied on Worthington to pay trust fund taxes faces similar potential difficulties. As "SS"—another former employee who had to address issues with his social security—stated, Worthington's actions "ultimately hurts alot of people that worked long and odd hours to help maintain and grow [Worthington's] business." Gov't Ex. 2 at 2 (SS email statement).

Separately, Worthington also willfully filed a materially false individual income tax return for the tax year 2016. PSR ¶ 11. The Form 1040, which Worthington filed jointly with his wife, falsely claimed $24,207 in federal income tax withholdings from Worthington's own

wages at HH Inc. *Id.* As Worthington well knew, however, no such taxes had been withheld from his wages or paid over to the IRS. *Id.* This falsity had the effect of reducing Worthington's tax liability such that he was able to claim—and receive—a $9,096 refund from the IRS. *Id.* Had Worthington instead accurately reported $0 in withholdings, he would have owed the IRS approximately $15,111 in taxes for tax year 2016. *Id.*

In addition to filing a false tax return in 2016, Worthington also failed to timely file individual tax returns for the tax years 2017 through 2021, despite knowing he was required to do so. *Id.* ¶ 12. He further failed to file U.S. Corporate Income Tax Returns (Forms 1120) on behalf of HH Inc. for the tax years 2016 through 2021. *Id.*

### 2. Worthington's Fraud-Funded Lifestyle

For his work running The Grill, Worthington paid himself an average tax-free salary of $162,022 from 2016 through 2021. Gov't Ex. 3 (Salary Chart). He also paid his wife, Sheri Worthington, an average of $16,075 per year. *Id.*

Separate from his salary, Worthington also used the business's funds to pay for various personal expenses, including mortgage payments on his home. Gov't Ex. 4 ¶¶ 28-29 (Memorandum of Interview of John Worthington). According to Worthington's own books and records, as of December 31, 2021, Worthington owed a balance of $668,116.63 to HH Inc. for his own personal expenses. Gov't Ex. 5 at 2 (HH Inc. Balance Sheets).

Worthington described these payments from HH Inc. as "advances" in excess of his payroll. Gov't Ex. 4 ¶ 29. And while Worthington kept track of the amounts spent by HH Inc. on his personal expenses, there is no evidence that Worthington ever seriously intended to pay these amounts back. No evidence was discovered during the Government's investigation that there was any sort of loan agreement between HH Inc. and Worthington, nor that interest was

being accrued or paid by Worthington, nor that any regular payments were being made, as would be customary with a true loan.

If these "advances" are treated as income to Worthington, then between 2016 and 2021, he paid himself a total of $1,640,251 from HH Inc., or approximately $273,375 a year in income upon which he did not pay any taxes. By comparison, in 2021 the top 95-99% of wage earners in the United States earned average annual wages of $215,032.[3] The median household income in Maryland was $97,330 in 2021.[4]

Worthington used this income to pay for a lifestyle that included international vacations, membership in a country club, season tickets to the Baltimore Orioles, and multiple family vehicles. PSR ¶ 10. In addition to mortgage payments and other personal expenses, Worthington also spent approximately $4,200 per month on out-of-state college tuition and expenses for his two children. Gov't Ex. 4 ¶ 44; Gov't Ex. 6 (Self-Report of Living Expenses).

## II.   Applicable Legal Standards

Sentencing the defendant begins with a properly calculated Guidelines range. *Gall v. United States*, 552 U.S. 38, 48-50 (2007). The applicable Guidelines range and policy statements "seek to embody the [18 U.S.C.] § 3553(a) considerations" and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 348-49 (2007). After

---

[3]   Elise Gould and Jori Kandra, *Inequality in Annual Earnings Worsens in 2021*, ECONOMIC POLICY INSTITUTE (Dec 21, 2022), https://www.epi.org/publication/inequality-2021-ssa-data/

[4]   *Maryland at a Glance*, Maryland Manual On-Line (Sept. 25, 2023), https://msa.maryland.gov/msa/mdmanual/01glance/economy/html/income.html

calculating the Guidelines range, the sentencing court must consider the resultant sentencing range along with factors listed in 18 U.S.C. § 3553(a) before arriving at the final sentence.

To the extent the Court is called upon to make findings of fact relevant to sentencing, those findings must only satisfy the preponderance of the evidence standard. *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008). In making such findings, "a sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). The Court may also rely on undisputed factual findings set forth in the Presentence Investigation Report. *United States v. Holman*, 354 F. App'x 791, 793-94 (4th Cir. 2009) (per curiam) (citing *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir. 1991)).

### III.   **Statutory Maximum Penalties**

Worthington pleaded guilty to two offenses charged in the Information.

Count One, Willful Failure to Account for and Pay Over Taxes, in violation of 26 U.S.C. § 7202, carries a maximum sentence of five years' imprisonment, three years of supervised release, a $250,000 fine (or a fine that is twice the gross gain or loss of the offense), the costs of prosecution, and a $100 special assessment. 26 U.S.C. § 7202; 18 U.S.C. § 3571 (general criminal fine statute); 18 U.S.C. § 3583 (supervised release).[5]

Count Two, Willfully Making and Subscribing a False Tax Return, in violation of 26 U.S.C. § 7206(1), carries a maximum sentence of three years' imprisonment, one year of

---

[5]   The general criminal fine statute, 18 U.S.C. § 3571, provides for higher maximum fines than those specified in the statute of conviction, unless the statute of conviction specifically exempts the offense from Section 3571's provisions. *See* 18 U.S.C. § 3571(e). Title 26 tax offenses are not exempted, so the higher limits of Section 3571 apply. *See, e.g.*, *United States v. Looney*, No. 04-16064, 2005 WL 2522519, at *8 (11th Cir. 2005).

supervised release, a $250,000 fine (or a fine that is twice the gross gain or loss of the offense), the costs of prosecution, and a $100 special assessment. 26 U.S.C. § 7206; 18 U.S.C. § 3571 (general criminal fine statute); 18 U.S.C. § 3583 (supervised release).

## IV.   Sentencing Guidelines Calculation

### A.   Base Offense Level

#### 1.   Applicable Guidelines Sections

Counts One and Two are grouped together for purposes of the Guidelines because the offense level for each is determined largely on the basis of total loss. U.S.S.G. § 3D1.2(d). Violations of 26 U.S.C. § 7202 are governed by Guidelines section 2T1.6 and violations of 26 U.S.C. § 7206(1) are governed by Guidelines section 2T1.1. Under both sections, the base offense level is calculated by determining the tax loss and selecting the offense level associated with that loss in the Tax Table at section 2T4.1. *Id.* §§ 2T1.1(a)(1); 2T1.6(a).

Tax loss is defined as "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." *Id.* § 2T1.1(c)(1). The tax loss calculation also includes tax loss resulting from relevant conduct, including uncharged conduct. *United States v. Baucom*, 360 F. App'x 457, 462 (4th Cir. 2010). For tax offenses, the Guidelines define relevant conduct broadly: "In determining the total tax loss attributable to the offense, *all conduct violating the tax laws* should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 cmt n. 2 (citing *id.* § 1B1.3(a)(2)) (emphasis added). The Government bears the burden of establishing the tax loss by a preponderance of the evidence. *United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010).

### 2. Tax Loss Calculation

In the plea agreement between the parties, the Government and Worthington agreed that the base offense level is 22, because the tax loss was more than $1,500,000 but not more than $3,500,000. Plea Agreement ¶ 6(a), ECF No. 11. More specifically, as described in the attached Statement of Facts, Worthington agreed that he "ultimately evaded payment on an amount of tax due and owing to the United States of at least approximately $2,813,348.94." *Id*. at 12.

That figure is comprised of Worthington's combined employment tax liabilities for the first quarter of 2010 through the last quarter of 2021. With respect to Worthington's employment tax liability for the fourth quarter of 2016 through the fourth quarter of 2021, which totals $1,447,963.42, the evidence in support of that figure (in addition to Worthington's admissions) consists of Forms W-2 for HH Inc.'s employees that were seized during the execution of a search warrant of HH Inc.'s business premises. *See* Gov't Ex. 7. For the first quarter of 2010 through the third quarter of 2016, which totals $1,365,385.52, the evidence in support consists of Form W-2 and other wage information reported to the IRS on individual income tax returns filed by employees of HH Inc. *See* Gov't Ex. 8.

### B. Adjustment for Acceptance of Responsibility

Based on Worthington's timely acceptance of responsibility, the Government agrees that he is entitled to a two-point reduction in offense levels pursuant to U.S.S.G. § 3E1.1(a) and moves for an additional one-point reduction pursuant to § 3E1.1(b).

### C. Adjustment for Zero-Point Offenders

Effective November 1, 2023, defendants who meet the criteria of U.S.S.G. § 4C1.1, which include, among other requirements, that the defendant did not receive any criminal history points, are entitled to receive a further two-point reduction in their offense level. U.S.S.G. § 4C1.1(a).

The Government does not oppose Worthington receiving a two-point reduction in offense levels pursuant to U.S.S.G. § 4C1.1(a). However, because the Government believes that Worthington's offense is serious, it opposes a departure to a sentence other than imprisonment. *See id.* § 5C1.1 cmt. n.10.

### D. Total Offense Level

Based upon the foregoing, the Government's recommendation is that Worthington's total offense level is 17. *See also* PSR at 7, 11 (recommending a total offense level of 19, but noting that the total offense level is 17 if applying the two-point reduction pursuant to Section 4C1.1).

### E. Criminal History Category

The Government agrees with the recommendation in the PSR that Worthington has a zero-point criminal history score and that his Criminal History Category is I. PSR ¶ 32.

### F. Final Guidelines Calculation

With a total offense level of 17 and a Criminal History Category of I, Worthington's advisory Guidelines range is **24-30 months' imprisonment**. U.S.S.G. Ch. 5 Pt. A (sentencing table). This places Worthington in Zone D, and the Guidelines recommend incarceration. *Id.*

## V. Section 3553(a) Sentencing Factors

After calculating the applicable Guidelines range, the sentencing court must then consider "the factors set forth in [18 U.S.C.] § 3553(a)." *Peugh v. United States*, 569 U.S. 530, 536 (2013). Here, consideration of the Section 3553(a) sentencing factors further emphasizes the need for a meaningful sentence within the Guidelines range.

### A. Worthington's Multi-Million Dollar, 25-Year-Long Fraud Is a Serious Offense

Tax fraud is serious. It is theft from the pockets of every taxpaying citizen of the United States and it undermines the integrity of the tax system upon which our nation and society depend. *See Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting) ("Taxes are what we pay for civilized society . . . ."). And it contributes to a significant, tangible problem: the annual "tax gap"—the difference between what is owed and what is paid nationwide—is projected to be $540 billion, as of the IRS's latest estimate. *See* The Tax Gap, IRS (last accessed October 23, 2023).[6]

That is why, as the Fourth Circuit has explained, "the policy statements issued by the Sentencing Commission make it clear that the Commission views tax evasion as a serious crime and believes that, under the pre-Guidelines practice, too many probationary sentences were imposed for tax crimes." *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010) (citing U.S.S.G. Ch. 1., Pt. A, introductory cmt. 4(d) (1998)); *see also* 18 U.S.C. § 3553(a)(5) (directing sentencing courts to consider applicable policy statements issued by the Sentencing Commission).

Worthington's tax crimes are especially serious. Over an 11-year period, he stole over $2.8 million from the United States. And there is every reason to believe that the true cost of Worthington's decades-long disregard for the law is much higher. IRS records indicate that Worthington has failed to file Forms 941 and pay over employment taxes since 1995—an additional 15 years of fraud with an undetermined tax loss. Moreover, as described above, Worthington's deception also cost his employees. Every former employee who relied on

---

[6] Available at https://www.irs.gov/newsroom/the-tax-gap#:~:text=Based%20on%20the%20projections%20for,projected%20to%20be%2085.1%20percent.

Worthington to fulfill his duty to pay over their taxes faces potential harmful consequences due to the Social Security Administration or the IRS having no record of their contributions. Unlike GC and SS, some of these former employees may lack the documentation or ability to navigate the bureaucratic process required to restore their benefits, especially if the discrepancy is only discovered years from now.

While Worthington's fraud would be inexcusable under any circumstances, the evidence shows he was not motivated by desperation. Rather, Worthington thought he was entitled to an affluent lifestyle that is out of reach for the vast majority of Americans—or at least those who play by the rules. His base motives and simple disrespect for the law enhances the seriousness of his crimes.

### B. A Significant Sentence Within the Guidelines Is Necessary to Achieve General Deterrence

Worthington's crimes were not spur-of-the-moment, irrational acts. They were the result of a rational calculation made year after year: that the benefit of the fraud outweighed the risk of getting caught and significantly punished.

For this reason, deterrence is of paramount importance for white-collar offenses. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)).

This is especially true of criminal tax cases, where prosecutions are relatively rare. "Because of the limited number of criminal tax prosecutions relative to the estimated incidence

13

of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." U.S.S.G. ch. 2, pt. T, introductory cmt.; *see also United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2011) (emphasized the need for sentencing courts to consider and respect the Sentencing Commission's focus on general deterrence when sentencing defendants for tax crimes).

Anything less than a significant prison sentence in this case would actively undermine the goal of general deterrence and encourage similar behavior by others. As the Eighth Circuit stated in vacating a non-prison sentence in a $240,000 tax evasion case, "the goal of deterrence rings hollow if a prison sentence is not imposed in this case." *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006); *see also* 18 U.S.C. § 3553(a)(2)(B).

## C. A Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities

In addition to achieving the goal of deterrence, a Guidelines sentence in line with the Government's recommendation will help prevent unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). In fashioning the Guidelines for tax offenses, the Sentencing Commission sought not only to achieve consistent sentences for similar tax crimes, but also to eliminate disparities in sentencing between white-collar offenses and equally serious *non* white-collar offenses. As former Justice Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 HOFSTRA L. REV. 1, 20 (1988).

Eliminating unwarranted sentencing disparities not only makes the criminal justice system more fair, it promotes respect for and faith in the law. *See* 18 U.S.C. § 3553(a)(2)(A). Simply put, when the public sees a defendant who has committed a serious white-collar offense walk away without a commensurate punishment, it fosters the belief that two systems of justice exist: one for the advantaged and one for the disadvantaged. *See United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."); *United States v. Muffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing the need for "the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

### D. Worthington's History and Characteristics Support a Guidelines Sentence

Section 3553(a)(1) also instructs the Court to consider a defendant's history and characteristics in fashioning a reasonable sentence. Unlike many criminal defendants, Worthington's decision to commit crime is not mitigated by a significantly disadvantaged background, such as a childhood marred by abuse or a broken family structure. To the contrary, Worthington reported to Probation that he had a normal upbringing with all of his needs met, and that he shares a close relationship with his family. PSR ¶ 40.

### E. Restitution

As part of his plea agreement, Worthington agreed to pay restitution to the IRS in the amount of $2,813,348.95. Plea Agreement ¶ 11, ECF No. 11. Pursuant to 18 U.S.C. § 3663(a)(3), a sentencing court may order restitution "in any criminal case to the extent agreed

to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). This includes criminal tax cases prosecuted under Title 26. *See United States v. Anderson*, 545 F.3d 1072, 1077-78 (D.C. Cir. 2008). Accordingly, the Government requests that the Court issue a restitution order directing Worthington to pay restitution as set forth in the plea agreement

In addition, to facilitate the IRS's restitution-based assessment that it is mandated to conduct pursuant to 26 U.S.C. § 6201(a)(4), the Government further requests that the Court include in its restitution order the table located at paragraph 13 of the parties' plea agreement, which is copied here below. *See* Plea Agreement, ¶ 13, ECF No. 11. The table provides a breakdown of the total restitution amount by tax year. Including this table in the restitution order will help the IRS assess the total restitution amount in the appropriate tax years.

| Tax Year(s) | Total Amount of Tax Loss |
|---|---|
| 2010 | $163,403.00 |
| 2011 | $158,652.52 |
| 2012 | $182,539.57 |
| 2013 | $196,650.00 |
| 2014 | $239,765.00 |
| 2015 | $196,693.00 |
| 2016 | $303,576.58 |
| 2017 | $300,497.05 |
| 2018 | $290,138.64 |
| 2019 | $282,445.53 |
| 2020 | $220,833.51 |
| 2021 | $278,154.54 |
| **TOTAL:** | **$2,813,348.94** |

## VI. Conclusion

For the reasons stated herein, the Government recommends sentencing the Defendant to 27 months' imprisonment, followed by 3 years of supervised release.

        Respectfully submitted,

        Erek L. Barron
        United States Attorney

        David A. Hubbert
        Deputy Assistant Attorney General
        U.S. Department of Justice, Tax Division

        _____
        Matthew L. Cofer
        Trial Attorney
        Jorge Almonte
        Assistant Chief
        U.S. Department of Justice, Tax Division
        Sean R. Delaney
        Assistant United States Attorney

## CERTIFICATE OF SERVICE

      I hereby certify that on November 6, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification to counsel of record for the defendant.

                                                  Matthew L. Cofer
                                                  Trial Attorney