

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview

---

**Investigation #:** ▮▮▮▮▮▮▮▮
**Investigation Name:** JOHN WORTHINGTON
**Date:** September 21, 2022
**Time:** Approximately 7:06 a.m. – 8:20 a.m.
**Participant(s):** JOHN WORTHINGTON, Taxpayer
Andrew Hippler, Special Agent
Marvin Harris, Special Agent

**Location:** WORTHINGTON residence
▮▮▮▮▮▮▮▮

On the above date and approximate time, Internal Revenue Service, Criminal Investigation ("IRS-CI"), Special Agents were executing a search warrant at the residence of JOHN H. WORTHINGTON (WORTHINGTON). SA Hippler and SA Harris presented their credentials to WORTHINGTON for his inspection. WORTHINGTON was advised that he was free to leave while the search warrant was being conducted, but told that if he chose to leave, he would not be allowed back on the premises until the conclusion of the search. WORTHINGTON was never placed in handcuffs or restrained. SA Hippler advised that he was assisting the Department of Justice ("DOJ") with an investigation into the taxes of HARRYMAN HOUSE, INC. ("HH INC") and WORTHINGTON's taxes. SA Hippler showed WORTHINGTON a copy of the search warrant for his residence and told him that it was a warrant signed by a federal magistrate judge to conduct a search of the residence for several violations, which SA Hippler pointed to on the warrant. WORTHINGTON told SA Hippler and SA Harris that he would tell them anything they wanted to know. During the interview WORTHINGTON stated the following:

1. His full name is JOHN HURST WORTHINGTON. He has no other aliases or nicknames. He was born on January 3, 1963, in Baltimore, Maryland. ▮▮▮▮▮▮▮▮, and that e-mail is used for personal and business purposes. He has been married to Sheri Worthington for approximately 29 years. He has two adult children, ▮▮▮▮▮▮▮▮ He owns the residence at ▮▮▮▮▮▮▮▮ which he purchased approximately 29 years ago. WORTHINGTON and his wife are the only residents. ▮▮▮▮▮▮▮▮ typically lives in the District of Columbia but is temporarily living at WORTHINGTON's residence.

2. In 1985, WORTHINGTON received a Bachelor of Arts degree from Trinity

Exhibit 4                                                                                                1

College in Hartford, Connecticut, where he majored in Economics. WORTHINGTON took introductory accounting courses as part of his major.

3. WORTHINGTON got involved with THE GRILL AT HARRYMAN HOUSE ("HARRYMAN HOUSE") after graduating from college in approximately 1985. From 1985 to 1989 there was an additional owner, ▮▮▮▮▮▮. WORTHINGTON has been running the business, but "not very well", since 1989. WORTHINGTON is the only owner of HARRYMAN HOUSE from 1989 to the present. HARRYMAN HOUSE hasn't made money in years.

4. The business address for HARRYMAN HOUSE is 340 Main Street, Reisterstown, MD 21136. WORTHINGTON rents the commercial property at that address from H&J Limited Partners ("H&J"). The owners of H&J are the Lewis Family. There are no other restaurant locations for HARRYMAN HOUSE, and there is no off-site storage or other office location. The only office for HARRYMAN HOUSE is upstairs at 340 Main Street, Reisterstown, MD 21136.

5. 340 Main Street, Inc. was the corporate entity that owned HARRYMAN HOUSE until approximately 1997. WORTHINGTON, through the assistance of lawyers, closed 340 Main Street, Inc., in approximately 1997, and created HARRYMAN HOUSE, INC. ("HH INC"), which trades as "THE GRILL AT HARRYMAN HOUSE".

6. 340 Main Street, Inc. received notices from the IRS in approximately 1989 related to unpaid payroll taxes. The reason for changing the legal entity from 340 Main Street, Inc., to HH INC was "to protect" the company based on advice from lawyers. This was in connection with an Offer in Compromise with the IRS that allowed WORTHINGTON to pay off the outstanding tax liability that 340 Main Street, Inc. had, except for penalties and interest which did not need to be paid as part of the agreement.

7. WORTHINGTON is the sole owner of HH INC and is the general manager of HARRYMAN HOUSE. WORTHINGTON goes into the restaurant 7 days per week, from approximately 7:30 a.m. to 7:00 p.m.

8. WORTHINGTON receives a salary of $180,000.00 per year from HH INC, and his wife, Sheri Worthington, receives a salary of $20,000.00 per year for managing the social media. Sheri Worthington is almost never on the HARRYMAN HOUSE property. WORTHINGTON's daughter, ▮▮▮▮▮▮ ▮▮▮▮▮▮, works part-time for HH INC as a hostess, and earned approximately $1,000.00 over the last year or two. WORTHINGTON's son, ▮▮▮▮▮▮▮▮▮▮▮ used to work for HH INC as a food runner at one point, but has not worked there in years.

9. HH INC has approximately 57 employees, comprised of approximately 13 to 15 cooks, 25 servers and bartenders, 3 to 4 managers, approximately 8 bussers and food runners, and 3 hostesses and carry-out workers.

10. ███████████████████████████.

11. WORTHINGTON is the only signer on all business bank accounts. HH INC uses Truist Bank and has four business accounts, including: a main cash account; a credit card account, which is where most of the activity is; a payroll account, where WORTHINGTON puts money in and ADP takes it out; and a small savings account. There are occasionally transfers between the accounts. Truist Bank has changed names approximately five times, first as Reisterstown Federal, and then Susquehanna Bank, and then BB&T, and then another name that WORTHINGTON couldn't recall.

12. Approximately 99 percent of customer payments to HH INC are made via credit card, with approximately one percent or less made via cash. HH INC uses a point of sale ("POS") system named Upserve, which WORTHINGTON believes is now called Lightspeed. WORTHINGTON started using Lightspeed in June of 2022 and was previously using First Data for payment processing.

13. HARRYMAN HOUSE bartenders close the bar registers each night, and the managers handle the rest of the registers. WORTHINGTON typically maintains approximately $2,700.00 of cash on the HARRYMAN HOUSE premises, comprised of approximately three bar banks of $350.00 each, and one restaurant bank of approximately $1,500.00.

14. WORTHINGTON does not use cash regularly and does not carry a lot of cash. WORTHINGTON has $50.00 in his pants pocket and does not have a safe or any other type of cash "horde" in his house. WORTHINGTON has no safety deposit boxes.

15. Corporate tax returns for HH INC have never been filed, and WORTHINGTON is aware that he is ultimately responsible for the filing of the business tax returns. WORTHINGTON is not familiar with what a "Form 1120" is but knows that HH INC has never filed any corporate tax returns. WORTHINGTON is confident that corporate tax returns were being filed for some years for 340 Main Street, Inc. WORTHINGTON is familiar with "Form 941" as being a payroll tax return.

16. WORTHINGTON knows that he owes payroll taxes, but he doesn't owe corporate taxes because his business doesn't make any money. WORTHINGTON keeps accurate books and records for HARRYMAN HOUSE and that's how he knows HH INC doesn't make any money. WORTHINGTON

has tried everything he can do to turn the business around, but it has just gotten harder.

17. ADP prepares the payroll for HH INC. WORTHINGTON handled payroll processing before ADP, with the assistance of the old accounting system, Comus. WORTHINGTON engaged ADP to begin processing payroll on January 1, 2022. SA Hippler asked WORTHINGTON why the switch to ADP, to which WORTHINGTON stated that he has been trying for 20 years to do the right thing and get HH INC set up so that he could sell the business and forget about it. WORTHINGTON wanted to sell the business in January of 2020 and then "this wouldn't have been an issue", but "then Covid hit". SA Harris asked WORTHINGTON if he meant the current situation with IRS-CI wouldn't have been an issue, and WORTHINGTON said, "All of it". WORTHINGTON was planning to sell the business during the first quarter of 2023.

18. Kelly Benefits was used to handle health insurance coverage for certain employees, but never used for payroll processing.

19. WORTHINGTON is the only person involved in the payroll process. Employees used to receive paper checks every two weeks, but all employees now receive their payroll via direct deposit.

20. ███████████ is a CPA that WORTHINGTON engaged in approximately 1985. Pie prepares the property tax returns for HH INC, but he hasn't prepared tax returns in years. ███ prepared corporate returns for WORTHINGTON in the past, for example for 340 Main Street, Inc. WORTHINGTON believes the last corporate return prepared would be in 1997 for 340 Main Street, Inc. For that corporate return, WORTHINGTON provided ███ with a "monthly book" that WORTHINGTON maintained. WORTHINGTON would typically take this to ███ in person. WORTHINGTON almost always communicated with ███ in person, but occasionally via phone or e-mail. WORTHINGTON meets with ███ typically two times per year.

21. WORTHINGTON switched from Comus accounting software to QuickBooks on June 1, 2021. WORTHINGTON is the only person who managed Comus and who currently manages QuickBooks. The HH INC managers have access to write checks occasionally but have not been trained on anything else.

22. WORTHINGTON keeps very good books and records in QuickBooks, and previously in Comus. WORTHINGTON can accurate determine what gross receipts are and what expenses are because he runs financial reports monthly and these financial reports are accurate. WORTHINGTON "keeps track of everything."

23. The Largest expenses for HH INC, in order, are labor, food, beer, wine, liquor, and rent. Other expenses include linen rentals, paper goods, cleaning supplies, and others. WORTHINGTON pays approximately $10,500.00 per month in rent, but right now rent is approximately $12,500.00 per month, or $150,000.00 per

Memorandum   Page 4 of 9                    U.S. Treasury Criminal Investigation

Exhibit 4                              4

year as the rental agreement was modified during Covid. WORTHINGTON is current on all rent payments.

24. All HH INC employees are paid via Form W-2, Wage and Tax Statement ("Form W-2"), and WORTHINGTON prepares and provides employees with the Forms W-2. There are no "1099 contractors" and no Forms 1099 are issued to anyone by HH INC. WORTHINGTON has paid all Maryland payroll taxes that he withheld for employees, but has not paid federal payroll taxes, even though they were withheld from employees' paychecks. WORTHINGTON hasn't paid the federal payroll taxes because he hasn't had the money to do so. In hindsight, WORTHINGTON believes he should have instead paid the federal taxes and not the state taxes, but it's now too late for that. WORTHINGTON knows how much is owed because the accounting system will show what has been withheld and what is currently due for withheld taxes.

25. A couple employees have approached WORTHINGTON over the years due to issues receiving their tax refund checks. WORTHINGTON would provide these employees with a letter on HARRYMAN HOUSE letterhead stating that WORTHINGTON was the employer and that the taxes were withheld. WORTHINGTON believes the employees would then provide this letter to the IRS and that it would resolve the issue for the employee because he never heard about it again.

26. Upon hiring new employees, WORTHINGTON obtains copies of either their driver's license and social security card, or passport to prepare the appropriate Form I-9, Employment Eligibility Verification.

27. WORTHINGTON does pay a couple employees in cash, for example the "cleaning guys" named ▮▮▮▮▮▮▮▮▮▮▮▮. He pays them $60.00 each per day for cleaning at HARRYMAN HOUSE from approximately 8:00 a.m. to 10:30 a.m., every day of the week.

28. HH INC pays WORTHINGTON's mortgage via a check issued from HH INC to WORTHINGTON with memos that typically denote "payroll advance". These advances are deducted from WORTHINGTON's payroll from HH INC, or in other words, the payroll that WORTHINGTON receives from HH INC will be reduced by the amount of any "advances" that he has received from HH INC. WORTHINGTON's mortgage payment is $2,476.01 per month, but the payment will go up soon because it is a variable rate, and he just received notification from the bank that the monthly payment will increase to approximately $2,700.00. WORTHINGTON believes the outstanding balance on his mortgage is approximately $300,000.00 but he is not sure.

29. WORTHINGTON has received "advances" in excess of his payroll of approximately $300,000.00. The balance of these advances is reported as an account in the QuickBooks file, potentially as something like a Loan to Owner account.

Exhibit 4                                5

30. WORTHINGTON occasionally writes checks to "cash" from the business accounts, for example to get change in the morning for the registers.

31. WORTHINGTON last filed a personal tax return a few years ago, which was prepared by ▮. WORTHINGTON has never self-prepared any personal tax returns. ▮ provides WORTHINGTON with a tax organizer and WORTHINGTON fills it out "for the most part" and then brings it back to ▮ office. For the preparation of WORTHINGTON's personal tax returns, WORTHINGTON also provides to ▮ a mortgage statement, his credit card interest, and his Form W-2.

32. SA Hippler presented WORTHINGTON with copies of Forms 4868, Application of Automatic Extension of Time to File U.S. Individual Income Tax Return ("Forms 4868") for the 2017, 2018, 2019, and 2020 tax years. WORTHINGTON recognized the Forms 4868 and verified his and his wife's names, the home address, and the social security numbers for both him and his wife on each Form 4868. WORTHINGTON believed ▮ helped him prepare these Forms 4868 and that he does not know how ▮ came up with the numbers reported for the estimated tax liability, but that ▮ may have used the prior year as an estimate. WORTHINGTON does not know if a Form 4868 was filed for the 2021 tax year.

33. SA Hippler presented WORTHINGTON with a copy of his 2016 Form 1040, U.S. Individual Income Tax Return ("Form 1040") and WORTHINGTON recognized the form. WORTHINGTON again confirmed his name, his wife's name, the home address, and the social security numbers for both him and his wife. WORTHINGTON believed the $136,135.00 of wages reported on the return was accurate and was the total wages paid from HH INC to WORTHINGTON during 2016. WORTHINGTON acknowledged that there was no other taxable income reported on the Form 1040 and that this was accurate. WORTHINGTON acknowledged that the 2016 Form 1040 reported $15,111.00 of payments as withholdings from wages. WORTHINGTON acknowledged that this resulted in a tax refund of $9,096.00 and that he recalls receiving that tax refund. WORTHINGTON believes that he and his wife both signed the 2016 Form 1040 electronically from their residence.

34. WORTHINGTON stopped filing personal tax returns after the 2016 tax year because he did not want to "exacerbate" the issues he had with the payroll tax returns that weren't filed. Referring to the tax refund he received for the 2016 tax year, WORTHINGTON stated that knows that he owes the federal government "a bunch of money" and he "didn't feel it was right to take that" money. WORTHINGTON knew this tax refund was based on money that he reported as withheld from his wages, and that he knew the withheld taxes were not actually paid over to the government.

35. WORTHINGTON received two Paycheck Protection Program ("PPP") loans through Truist Bank. The funds from the PPP loans were used exclusively for payroll and operating expenses for HH INC, nothing else. WORTHINGTON

Memorandum    Page 6 of 9                      U.S. Treasury Criminal Investigation

Exhibit 4                                    6

filled out the applications for the PPP loans, and the loan forgiveness applications, and he provided all the supporting documentation to Truist Bank. WORTHINGTON has copies of all of this documentation in his office at work and would be happy to provide it to the government.

36. WORTHINGTON used his personal laptop to prepare Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return ("Forms 940") and Forms 941, Employer's Quarterly Federal Tax Return ("Forms 941") at his office, and submitted them to Truist Bank with the PPP applications, and loan forgiveness applications. WORTHINGTON prepared these returns exclusively for the purpose of obtaining the PPP loans.

37. SA Hippler presented WORTHINGTON with a copy of the PPP, Borrower Application Form. WORTHINGTON recognized the form and confirmed that he filled it out and that this was his handwriting. WORTHINGTON recalls the loan being $246,150.00. He acknowledged that he read and signed all the certifications on the application and verified his initials and signature on the form.

38. SA Hippler presented WORTHINGTON with a copy of the PPP Loan Forgiveness Application Form 3508. WORTHINGTON recognized the form and confirmed that it was filled out electronically. He recalls Truist Bank setting up the form electronically at some point, so it was no longer prepared by hand. WORTHINGTON again confirmed that he read and initialed all of the certifications on the form when he prepared it and he confirmed his electronic signature on the 2nd page of the form, dated April 5, 2021. SA Hippler called WORTHINGTON's attention to a certification reading "The tax documents I have submitted to the Lender (if applicable) are consistent with those the Borrower has submitted/will submit to the IRS". WORTHINGTON acknowledged this certification and stated that it said, "will submit to the IRS" and that his intent was to submit the tax returns to the IRS. SA Hippler asked WORTHINGTON if it was truly his intent to file the tax returns at the time this form was created to which WORTHINGTON replied that he didn't file because he didn't have the money and that he intended to sell the business. He stated that after he sold the business for as much as possible that his plan was to square up his taxes with the government.

39. SA Hippler presented WORTHINGTON with the PPP, Second Draw Borrower Application Form, and the associated PPP, Loan Forgiveness Application Form 3508, relating to the second PPP loan that WORTHINGTON received in the amount of $350,000.00. WORTHINGTON verified that he prepared these documents electronically and that he reviewed and initialed all certifications. WORTHINGTON also verified his electronic signature on each document.

40. SA Hippler also presented WORTHINGTON with a "gross receipts comparison worksheet for second draw PPP loans". WORTHINGTON stated that this was a document prepared by Truist Bank with instructions for how to calculate changes in gross receipts for PPP purposes. Enclosed in the document

presented to WORTHINGTON there was included various schedules and copies of Maryland Sales and Use Tax Returns. WORTHINGTON confirmed that these were documents that he prepared and provided to Truist Bank in connection with the PPP loans.

41. WORTHINGTON has no real sources of income other than HH INC. He has a couple investment accounts with small amounts of holdings in certain mutual funds, but they make only approximately $1,000.00 per year in investment gains. These investment gains stay in the account and are not taken out.

42. WORTHINGTON and his wife do not come from wealthy families. His father passed away and WORTHINGTON received no inheritance. WORTHINGTON's mother is still alive and lives approximately one-half mile away from him.

43. WORTHINGTON has never been unemployed and has never received any unemployment compensation. WORTHINGTON does recall an issue one year with the Maryland Department of Labor (DOL) where he was informed that someone may have claimed unemployment in his name. WORTHINGTON stated he told the DOL that this was a false claim and that he had never received any unemployment money. WORTHINGTON has never received any unemployment income from Ohio or Colorado and does not know anyone who lives in Ohio or Colorado.

44. █████████████████████████████████████████ WORTHINGTON paid all tuition for both children.

45. WORTHINGTON makes no child support payments or alimony payments. WORTHINGTON has no sources of non-taxable funds, including no personal loans other than credit cards, and no other gifts or inheritances were received by WORTHINGTON or his wife.

46. WORTHINGTON makes vehicle loan payments including to: Bank of America for his vehicle, the Jeep Cherokee; Wells Fargo, for his daughter's Jeep Cherokee; and to M&T Bank for his wife's Volvo.

47. WORTHINGTON and his wife do not own any other businesses, real estate, or real property. WORTHINGTON does not own any property in Hyattsville, Maryland. WORTHINGTON has never rented out his house or part of his house.

48. WORTHINGTON was briefly involved with ownership in another business, Milton Inn, as a partial owner in approximately 1987. WORTHINGTON gave away his shares in Milton Inn shortly thereafter.

49. WORTHINGTON does not own any boats. WORTHINGTON does play golf and does travel occasionally. His most recent vacations included two weddings: one

Memorandum   Page 8 of 9                                   U.S. Treasury Criminal Investigation

Exhibit 4                           8

in New Hampshire, and one in Newport, Rhode Island. WORTHINGTON does not gamble, except for purchasing an occasional lottery ticket.

50. WORTHINGTON does have life insurance policies and the premiums are paid by HH INC. "Key man insurance" is a requirement per the commercial property lease that WORTHINGTON signed.

51. Sales dropped significantly to "small levels" during Covid-19, and labor became very difficult. Since then, prices for everything have increased significantly with inflation and things have really gotten a lot harder for HH INC. WORTHINGTON only had to shut down operations for HARRYMAN HOUSE for one day because of Covid. After that, HARRYMAN HOUSE transitioned to carry out only for a period, before returning to a regular operating schedule.

52. WORTHINGTON's family has no idea about the unpaid taxes, and this is his "dirty little secret". SA Harris asked WORTHINGTON if he was expecting contact from IRS-CI, and WORTHINGTON replied that he didn't know it would be in this fashion, but that he knew "judgment day was coming" and that he was just trying to sell the business but "Covid destroyed everything" and the "business had no value". WORTHINGTON's goal was to sell the business and pay off as much of the tax bill as possible.

53. WORTHINGTON stated that he doesn't sleep and doesn't have a solution to fix the business. WORTHINGTON considers his employees as part of his family and feels responsible for their income, so he has never wanted to shut the business down. WORTHINGTON is "not a liar" and "not an embezzler", rather he is "just not a good businessman". He is very embarrassed by this situation.

The interview was terminated at approximately 8:20 a.m. I prepared this memorandum on September 22, 2022, after refreshing my memory from notes made during and immediately after the interview with JOHN H. WORTHINGTON.

*Andrew Hippler*
Andrew Hippler
Special Agent

*Marvin L. Harris*
Marvin Harris
Special Agent